

April 28, 2025

VIA ELECTRONIC FILING
Office of the Clerk
U.S. Court of Appeals for the Seventh Circuit
Everett McKinley Dirksen - United States Courthouse
Room 2722
219 S. Dearborn Street
Chicago, IL 60604

      RE:    *The Estate of Ceasar Stinson, et al vs. Joel Streicher*, Appeal No. 22-3043
               Plaintiffs-Appellees' Fed. R. App. Pro. 28(j)/Circuit Rule 28(e) Notice of Supplemental Authority

Dear Clerk:

This letter is to notify this Court of new, pertinent legal authority in the above-referenced appeal pursuant to Fed. R. App. Pro. 28(j) and Circuit Rule 28(e).

On April 17, 2025, this Court issued its opinion in *Kelsy Jill Smith v. Michael Whitsel*, Appeal No. 24-1694 (per curiam), a copy of which is enclosed. This Court's discussion in *Smith* that it lacks jurisdiction on an interlocutory appeal to review a denial of qualified immunity when the district court's decision or the appellant's argument turns on disputes of material fact (*Smith* Slip Op. at pp. 6,9) is relevant to Plaintiffs-Appellees' argument that there is no appellate jurisdiction for Defendant-Appellant Joel Streicher's appeal in this case because, as the district court in *Stinson* found, resolving qualified immunity turns on "competing inferences and credibility determinations," as set forth at Argument Part I(A) & (B) at pages 13-15 of the Brief of Plaintiffs-Appellees. (Seventh Circuit Docket 31) Additionally, this Court's discussion in *Smith* that a "sufficiency of the evidence" argument cannot be considered in an interlocutory appeal regarding qualified immunity (*Smith* Slip Op. at p.8) is also relevant to Plaintiffs-Appellees' argument that there is no legal question giving this Court appellate jurisdiction because what Streicher is improperly arguing is that the evidence is insufficient to establish a substantive due process claim, as set forth at pages 20-21 of the Brief of Plaintiffs-Appellants. (Seventh Circuit Docket 31)

In compliance with Rule 28(j), the body of this letter contains 234 words.

Sincerely,

**GINGRAS, THOMSEN & WACHS, LLP**

s/Mark L. Thomsen
Mark L. Thomsen
Sarah F. Kaas
Direct Dial: (414) 935-5482
Email: mthomsen@gtwlawyers.com
         skaas@gtwlawyers.com

| Eau Claire | Madison | Milwaukee | Waukesha |
|---|---|---|---|
| 101 Putnam Street, P.O. Box 390 | 8150 Excelsior Drive | 219 N Milwaukee Street, Ste. 520 | 741 N Grand Avenue, Ste. 209 |
| Eau Claire, WI 54703 | Madison, WI 53717 | Milwaukee, WI 53202 | Waukesha, WI 53188 |
| Phone: (715) 839-9500 | Phone: (608) 833-2632 | Phone: (414) 837-4167 | Phone: (414) 837-4167 |
| Fax: (715) 839-9571 | Fax: (608) 833-2874 | Fax: (414) 763-6413 | Fax: (414) 763-6413 |

*Counsel for Plaintiffs-Appellees, the Estate of
Ceasar Stinson and Chipo Samvura*

cc:      Mr. Andrew A. Jones (via e-filing)
         Mr. Thomas Donnelly (via e-filing)
         Mr. James F. Cirincione (via e-filing)
         Mr. John W. McCauley (via e-filing)

In the

# United States Court of Appeals

## For the Seventh Circuit

No. 24-1694

KELSEY JILL SMITH, as Administrator of the Estate of Dalynn Kee, and on behalf of her Next of Kin,

*Plaintiff-Appellee,*

*v.*

MICHAEL WHITSEL,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 20-2203 — **Sara Darrow**, *Chief Judge.*

ARGUED MARCH 4, 2025 — DECIDED APRIL 17, 2025

Before BRENNAN, ST. EVE, and MALDONADO, *Circuit Judges.*

PER CURIAM. Dalynn Kee died of dehydration while detained at the Macon County Jail in Decatur, Illinois. The administrator of Kee's estate sued (among others) correctional officer Michael Whitsel, alleging that he violated Kee's constitutional rights by denying her access to medical care when she became violently ill from opioid withdrawal. Whitsel moved for summary judgment on the ground of qualified

immunity, but the district court denied his motion because genuine issues of material fact precluded the defense "at this stage."

Whitsel filed an interlocutory appeal. But whether he enjoys qualified immunity depends on the resolution of disputed facts, so the collateral order doctrine does not confer jurisdiction. We therefore dismiss this appeal.

# I

We recount the facts in the light most favorable to Kee, the non-moving party, addressing only the facts relevant to Whitsel's appeal. *See McGee v. Parsano*, 55 F.4th 563, 566 (7th Cir. 2022).

On October 7, 2019, Kee was arrested and detained at the Macon County Jail. During the intake process, she told staff she was receiving methadone for opioid use disorder and had experienced withdrawal symptoms in the past. At first, Kee was placed on the jail's withdrawal protocol, which consisted of periodic assessments and medication to manage symptoms of withdrawal like nausea, diarrhea, anxiety, and restlessness. But on October 13, nursing staff ended the protocol.

On October 16, after Kee refused to eat and reported vomiting, jail staff moved her to the medical unit. That unit had two cells, both equipped with motion-activated video cameras that allowed staff to watch the occupants remotely. The parties dispute whether nurses or correctional officers had primary responsibility for observing detainees in medical cells, but for the purpose of this appeal, we assume the correctional officers have "primary observation responsibility."

The critical events in this case took place on October 17. Over the night of October 16, Kee vomited more than 25

times. Nursing staff gave Kee anti-nausea medication first thing in the morning, then again around 1:00 p.m. Beginning at 2:30 p.m. Michael Whitsel was the correctional officer responsible for the medical unit. He was required to conduct well-being checks every 30 minutes, during which he was to observe each detainee for 10 to 12 seconds, paying special attention to their movements and breathing to assess their health and safety. When not conducting well-being checks, Whitsel testified he spent the "majority" of his shift monitoring the video feeds of the detainees.

Because correctional officers must unlock the cells for medical staff, Whitsel opened Kee's cell at 2:48 p.m. for a nurse to give Kee commissary items and toilet paper. The record does not reveal any further interactions between medical staff and Kee until she was found unresponsive just under four hours later.

Whitsel said he did not see anything out of the ordinary during his well-being checks and he did not recall seeing Kee vomiting on the video feed. Even so, Whitsel's supervisor testified Whitsel told him Kee was vomiting around 3:30 p.m., and Whitsel testified that he noticed vomit on Kee's bed around 4:15 p.m. Whitsel also saw via video around 5:15 p.m. that Kee was on the floor, and a few minutes later when he delivered her dinner, he saw her hands were cramping. Whitsel did not inform the nurse of any of these symptoms, never asked her to examine Kee, and did not know whether she checked on Kee.

The video feed Whitsel was purportedly monitoring shows that Kee exhibited concerning symptoms throughout that afternoon. Between 2:30 and 6:00 p.m., the video shows

Kee vomited at least seven times, including onto the floor (three times) and onto her bed. The red vomit on the floor is visible from 4:30 p.m. on. Kee also fell three times. Each time, she remained on the floor for more than fifteen seconds. During the second fall, she hit her head on the concrete floor before she lay motionless. She eventually got back on her bed, but just before Whitsel's 5:56 p.m. well-being check—which lasted about three seconds—Kee removed her soiled pants, leaving her naked from the waist down, with her bare buttocks clearly visible.

At 6:01 p.m., Kee rolled onto her back, revealing her bare legs and pubic area. She did not move again. The Estate asserts a jury could infer Kee died around 6:01 p.m. But Whitsel did not notice Kee's nudity for over ten minutes. Then Kee did not respond to his command over the intercom to put her pants back on. Seven minutes later, Whitsel again ordered Kee to cover up, and again she did not respond. He informed his supervisor, but he did not inform medical staff. At 6:22 p.m., Whitsel conducted a one-to-two second well-being check and testified he saw Kee's chest rising at that time. But he did not report to the medical staff she was half-naked and not responsive to him. Minutes after this check, at 6:30 p.m., Whitsel went on his meal break.

Less than five minutes later, the nurse looked into Kee's cell and noticed she was pale and not breathing. Staff began CPR and called an ambulance to take her to the hospital. There, Kee was pronounced dead. The cause of death per an autopsy report was dehydration.

Relevant to this appeal, the administrator of Kee's estate sued Whitsel for failing to provide adequate medical care in violation of the Fourteenth Amendment. *See* 42 U.S.C. § 1983.

After discovery, Whitsel moved for summary judgment. He argued the record lacked sufficient evidence to allow a jury to find that his actions were objectively unreasonable, and in the alternative, he was entitled to qualified immunity.

The district court denied his motion. The court ruled that, as a correctional officer, Whitsel had the duty to act in an objectively reasonable manner to ensure Kee's access to adequate medical care. *See McGee*, 55 F.4th at 569. It further concluded that, if a jury credited Whitsel's testimony that he watched the video feeds throughout his shift, it could find that Whitsel acted unreasonably when he failed to notify medical staff of Kee's symptoms. And because the parties disputed the scope of Whitsel's duty to monitor the cells, Kee's detention in a medical cell was not, on its own, sufficient evidence that Whitsel was entitled to defer to the medical staff for her medical care.

The district court could not determine if Whitsel was entitled to qualified immunity "at this stage" because whether he violated Kee's constitutional rights "turns on the resolution of factual disputes." The court stated that, in 2019, the law clearly established that non-medical jail staff may not ignore a detainee in obvious medical distress. *See Dobbey v. Mitchell-Lawshea*, 806 F.3d 938, 941 (7th Cir. 2015). And even if the detainee was under the care of medical professionals, an officer could not reasonably defer to them if there was reason to believe the detainee was not receiving treatment or the treatment was clearly inadequate.

II

Under the collateral order doctrine, a defendant may immediately appeal an order denying qualified immunity on

summary judgment because it "amounts to a final decision on the defendant's right not to stand trial." *Gant v. Hartman*, 924 F.3d 445, 448 (7th Cir. 2019). But, as we have repeatedly explained, an interlocutory appeal is available only if this court can review the denial of qualified immunity as a matter of law. *Johnson v. Jones*, 515 U.S. 304, 319–20 (1995); *see, e.g.*, *Davis v. Allen*, 112 F.4th 487, 492–93 (7th Cir. 2024); *Stewardson v. Biggs*, 43 F.4th 732, 734 (7th Cir. 2022); *Ferguson v. McDonough*, 13 F.4th 574, 579–580 (7th Cir. 2021); *Koh v. Ustich*, 933 F.3d 836, 843–44 (7th Cir. 2019); *Stinson v. Gauger*, 868 F.3d 516, 524–25 (7th Cir. 2017) (en banc).

We lack jurisdiction on an interlocutory appeal to review a denial of qualified immunity when the district court's decision, or the appellant's argument, turns on disputes of material fact, *see Stewardson*, 43 F.4th at 734, when the legal question involves a mixed question of law and fact, *see Smith v. Finkley*, 10 F.4th 725, 735 (7th Cir. 2021), or when the appellant challenges the sufficiency of the evidence, *see Davis*, 112 F.4th at 494. And we may not reconsider a district court's determination that certain genuine issues of fact exist as to a particular point. *See Bayon v. Berkebile*, 29 F.4th 850, 854 (7th Cir. 2022). The line between an appealable and non-appealable issue is "not always clear," *Smith*, 10 F.4th at 735, but here it is.

### A

Whitsel argues first that the district court applied the wrong legal rule to evaluate his liability. He asserts that the court applied the general rule that correctional officers may not ignore plaintiffs in obvious distress, *see, e.g.*, *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010), when it should have applied the medical-deference rule, namely, that nonmedical jail staff can defer to the professional judgment of medical

staff, *see, e.g., King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2013).

But the district court ruled it could not determine which legal rule to apply because facts are in dispute. These include whether medical staff exercised medical judgment as to Kee's escalating symptoms; the scope of medical and correctional staff's respective duties in observing and communicating information about detainees in the medical unit; what Whitsel saw (a subject of conflicting testimony); whether Whitsel was watching the video feed when not conducting well-being checks (a credibility determination); and what a reasonable lay person would have inferred from the video.

Even in Whitsel's framing of the issue, whether he reasonably deferred to the professional judgment of medical staff—and whether any such judgment was exercised here—is a mixed question of law and fact. He has thus "interpos[ed] disputed factual issues in his argument." *Smith*, 10 F.4th at 735. Specifically, Whitsel argues that undisputed evidence shows Kee was "under the care of medical experts," *McGee*, 55 F.4th at 569, so he could reasonably defer to medical staff. But correctional staff can escape liability only when they reasonably defer to the judgment of medical professionals. *See Miranda v. Cnty. of Lake*, 900 F.3d 335, 343 (7th Cir. 2018). As previously discussed, the district court found that disputed facts prevented a finding that medical staff exercised any judgment throughout the afternoon of October 17, and on this record we do not second-guess that conclusion. *See Gant*, 924 F.3d at 448.

Further, Whitsel cites no authority to show that when detainees are housed in medical units, correctional officers have no constitutional duties as to their medical needs. Rather, he submits that if Whitsel could not defer to medical staff in this

circumstance, it "would strain the division of labor" in a correctional setting. But here, Whitsel ignores his concession on appeal: that the "division of labor" required him, not medical staff, to observe Kee. Yet, he admits that he occasionally "observed" Kee, in person and on the monitor. We decline to decide at this stage that to "observe" carries no duty other than to physically look at a detainee, no matter her condition. In any event, his "back-door" effort to dispute the facts regarding the division of labor deprives us of jurisdiction to consider his appeal. *Stewardson*, 43 F.4th at 736.

**B**

Whitsel next argues that, assuming the medical-deference rule applies, the record is devoid of evidence that he "knew or had reason to know" that Kee was not being treated or was being inadequately treated. He therefore concludes that "deferring" to the judgment of the medical staff was proper.

On interlocutory appeal, though, we cannot decide Whitsel's challenge to the sufficiency of the evidence that he knew or could have known that medical staff were not treating Kee. *See Johnson*, 515 U.S. at 313. It remains to be decided whether the medical staff exercised professional judgment in treating, or not treating, Kee for her severe dehydration and other effects of opioid withdrawal. Further, Whitsel escapes liability only if he "reasonably relied" on the judgment of medical professionals. *Miranda*, 900 F.3d at 343. Per his concession, Whitsel, not medical staff, had the primary responsibility to observe Kee. By not informing staff of Kee's developing symptoms—particularly the blow to the head, falls, confusion, and visible cramping—Whitsel could not have reasonably relied on the medical judgment of nurses who lacked the information he had from his observations.

Whitsel next offers a legal argument that knowledge of a detainee's symptoms is different from knowledge that "the medical staff was failing to treat or inadequately treating an inmate." *See McGee*, 55 F.4th at 569 (cleaned up). But even in the abstract, that argument does not resolve whether, as a matter of law, Whitsel is entitled to qualified immunity. He is correct that knowledge of symptoms and level of care are not the same. But the cases he cites did not absolve the correctional officer because, as Whitsel posits, "the officer [saw] medical personnel assessing or treating an inmate during his shift." Instead, the officers in these cases prevailed because they did not ignore the prisoner's symptoms of distress. In each case, officers relayed relevant information to medical staff or at least responded to an emergency at the same time as medical staff exercising their judgment. *See McGee*, 55 F.4th at 573–74 (nurse told officers that prisoner was "faking"); *King*, 680 F.3d at 1016–18 (officers "immediately" notified nursing staff of prisoner's symptoms); *Estate of Perry v. Wenzel*, 872 F.3d 439, 449–50, 458 (7th Cir. 2017) (officers followed nurses' instructions).

A jury could find that Whitsel had reason to know that medical staff failed to treat Kee. He witnessed her escalating symptoms. And he knew medical staff were not aware of her situation because he never saw them administering care and he did not inform them of her condition.

His argument is thus "dependent upon, and inseparable from," disputed facts about what Whitsel knew, who he told, and the reasonable inferences a jury could draw from the video about the severity of her symptoms. *See Ferguson*, 13 F.4th at 580. For these reasons, we DISMISS this appeal for lack of appellate jurisdiction.